**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

RUSHANDA MIZE,

        Plaintiff,

v.                                  Case No. 08-CV-10660-DT

RALPH TEDFORD, and CITY OF FLINT, a
municipal corporation,

        Defendants.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before the court is a motion for summary judgment, filed on March 11,

2009 by Defendant City of Flint.  The court conducted a hearing on the motion on May

13, 2009.  *See* E.D. Mich. LR 7.1(e)(2).  For the reasons stated below, the court will

grant the motion.

**I.  INTRODUCTION**

On February 13, 2008, Rushanda Mize brought this cause of action under 42

U.S.C. § 1983 against Defendant Ralph Tedford and the City of Flint ("Flint") alleging

that both Tedford and Flint violated her constitutional rights.  Her cause of action stems

from her allegation that Defendant Tedford forcibly raped her while on duty the night of

September 2, 2007.  Plaintiff contends that Flint's official policies or customs (or lack

thereof) were a "moving force" behind the deprivation of Plaintiff's rights and arose as a

result of "deliberate indifference" to her rights.  *See Doe v. Claiborne County*, 103 F.3d

495, 508 (6th Cir. 1996).  Specifically, she argues that her injuries directly resulted from

the complete lack of supervision over Tedford's unit, the Flint Police Department's

Citizen Service Bureau ("CSB").  For the reasons stated below, the court finds that

Plaintiff's claim against Flint fails as a matter of law, and the court will therefore grant

Defendant's motion for summary judgment.

## II.  BACKGROUND[1]

On September 2, 2007, Plaintiff was driving home, with her cousin, from a night

club while she was "a little drunk."  (Def.'s Fact 1, Pl.'s Fact 1.)  While driving in the City

of Flint, Plaintiff was pulled over by Defendant Inspector Ralph Tedford, who at the time

was a member of the Flint Police Department's CSB.  (Def.'s Fact 2, Pl.'s Fact 2.)  The

CSB was a community policing bureau created by Flint Mayor Don Williamson to work

with the community to combat Flint's high crime rate.  (Def.'s Fact 2-3 & n.1, Pl.'s Fact

2-3.)  The CSB was staffed by four Inspectors and one Major; the Inspectors reported to

CSB Major John Keahey who in turn reported to Chief of Police Gary Hagler. (Def.'s

Fact 4, Pl.'s Fact 4.)  In the Flint Police Department's chain of command, the Major

position was a higher rank than the shift lieutenant position, which was the position of

highest rank during the midnight shift of September 2, 2007.[2]  (Pl's Fact 4, citing Sutter

Dep. at 6-8, Pl.'s Ex. A.)

---

[1]Unless otherwise stated, the following facts were proposed by Defendant and specifically admitted by Plaintiff.

[2]Plaintiff submits that the Inspectors were also higher ranking than the shift lieutenant, but the cited deposition testimony does not necessarily support this assertion.  Lieutenant Scott Sutter testified that he was not sure of the hierarchy of the CSB but that he believed "they were – *at least the major* was higher than the captains." (Sutter Dep at  at 6, Pl.'s Ex. A, emphasis added.)  Whether or not the Inspectors were higher ranking than the lieutenant is not material for purposes of this motion, but the court will view this testimony in a light most favorable to Plaintiff and accept that it is possible the Inspectors were higher ranking.

When Defendant Tedford made the traffic stop of Plaintiff he radioed his location in to the Flint dispatch office.  (Def.'s Fact 5, Pl.'s Fact 5.)  Tedford made no further communication with dispatch until 47 minutes later.  (*Id.*)  Tedford's failure to radio in contact during this period was a violation of the police rules and regulations and CSB personnel were instructed to "check in."  (Def.'s Fact 6, Pl.'s Fact 6.)  Sergeant Lee Ann Gaspar testified that Tedford may not have been checked on during those forty-seven minutes because she "think[s] people feared retribution."  (Gasper Dep. At 41-42, Pl.'s Ex. D.)

What happened during the forty-seven minutes that Tedford remained out of contact is disputed by the parties.  According to Plaintiff's account, Tedford placed her in the back of his police vehicle, flirted with her, and, although she repeatedly asked to be taken home, he instead took her to a Flint Police building[3] where he forcibly raped her.  (Pl.'s Facts 7-11.)  Defendant Tedford does not dispute that he had sexual intercourse with Plaintiff, but claims that she flirted with him and that the sexual contact was consensual.  (Def. Fact 11.)  For purposes of this motion, the court accepts Plaintiff's version of the facts.

Later in the day on September 2, 2007, the Flint Police Department received a call from a social worker at Hurley Hospital reporting the alleged rape of Plaintiff by a Flint Police Officer.  (Def.'s Fact 12, Pl.'s Fact 12.)  Upon receipt of the call, Flint Police immediately began securing evidence and conducting an investigation.  (Def.'s Fact 13, Pl.'s Fact 13.)   Lieutenant John Bundy, who took the initial report, relayed the report to

---

[3]The building was a "mini-station" which was currently an empty building being used as a resource center.  (Pl.'s Ex. A at 85-85.)

Captain Scott Sutter, who immediately contacted the Flint Internal Affairs Bureau and Detective Bureau.  (*Id.*)  Sutter dispatched an officer to "stand by" with Mize at the hospital.  (*Id.*)  Despite some initial difficulty finding someone other than the CSB Inspectors who had keys to the mini-station, a Flint Police Officer was eventually located who went to the scene to "stand by" or secure it.  (Pl.'s Fact 13, Pl.'s Ex. A at 84-88.)

Plaintiff and her cousin, who was with her when she was pulled over, both identified Defendant Tedford out of a photo book.  (Def.'s Fact 14, Pl.'s Fact 14.)  Sutter was in contact with Police Chief Hagler, who decided that the criminal investigation should be conducted by the Michigan State Police department and that the Flint Police Department would handle its own internal investigation.  (Def.'s Fact 15, Pl.'s Fact 15.)  Michigan State Police Sergeant Ogg was sent to Flint to perform the investigation. (Def.'s Fact 16, Pl.'s Fact 16.)  Flint Police surveilled Tedford's home until Sergeant Ogg arrived in Flint.  (Def.'s Fact 17, Pl.'s Fact 17.)  When Ogg arrived, he and Flint Police Lieutenant Birnie knocked on Tedford's door, around 3:30 a.m. on September 3, 2007 and took him into custody.  (Def.'s Fact 17, Pl.'s Fact 17.)

At the time that Tedford was placed into custody, at his home where he was apparently asleep, he was scheduled to be on duty.  (Def.'s Fact 18, Pl.'s Fact 18.) Tedford's supervisor, Major Keahey testified that he did not know that Tedford was not at work, nor did he have an explanation for why he was at home.  (*Id.*)

Tedford was taken to the State Police Post, where he was interviewed by Sergeant Ogg.  (Def.'s Fact 19, Pl.'s Fact 19.)  Tedford admitted that he had sexual contact with Plaintiff, but he asserted that the contact was consensual.  (*Id.*)  At the

4

conclusion of the interview, Tedford was relieved of duty.  (*Id.*)  His gun, badge, and police cruiser were confiscated, and he never served as a Flint Police Officer again. (*Id.*)  During the investigation, Tedford was placed on administrative leave.  (Def.'s Fact 20, Pl.'s Fact 20.)[4]  Tedford eventually pleaded guilty to Public Officer–Willful Neglect of Duty on March 8, 2008, and he resigned from the Flint Police Department.  (Def.'s Fact 21, Pl.'s Fact 21.)  Chief Hagler and Lieutenant Sutter have testified that if Tedford had not resigned, he would have been terminated.  (Def.'s Fact 22, Pl.'s Fact 22.)

Following his internal investigation, Sutter provided an investigation report to Chief Gary Hagler. At the conclusion of his report, Sutter identified fourteen rules and regulations of the Flint Police that Tedford had violated. (Def.'s Fact 23, Pl.'s Fact 23.) Defendants assert that the internal investigation of Tedford followed specific department policies relating to complaints against police officers.  Flint has a policy of investigating every criminal complaint made against its officers, including anonymous complaints. (Def.'s Fact 24, Pl.'s Fact 24.)  When a complaint is received it is reviewed by a supervisor who determines whether the officer's conduct was appropriate, and only personnel with the rank of sergeant and above can investigate complaints. (Def.'s Fact 25, Pl.'s Fact 25.) This supervisor will then make a recommendation as to the outcome and will forward that recommendation up the chain of command until it reaches the chief of police.  (Def.'s Fact 25, Pl.'s Fact 25.)  It is the chief of police - not the officer who takes the complaint, the supervisor who reviews it, or any other lower ranking officers - who makes the final decision as to the disposition of the matter.  (Def.'s Fact 26, Pl.'s

---

[4]In Plaintiff's response to Defendant's proposed fact, Plaintiff admits that "Sutter has so testified."  Unless Plaintiff has proposed a competing fact, the court has accepted such responses as an agreement that the fact is not materially disputed.

Fact 26.)  In some circumstances, the Division of Inspections (*i.e.*, internal affairs

division) may be called upon to perform an investigation and, in such cases, the Division

of Inspections will offer its conclusions regarding discipline of the individual officer, and

that conclusion is sent up the chain of command until it reaches the chief of police.

(Def.'s Fact 27, Pl.'s Fact 27.)

In the CSB, complaints were ordinarily handled by Major Keahey and the

Chief but, because of the severity of the allegations, Tedford's investigation was

handled by Sutter.  (Def.'s Fact 28, Pl.'s Fact 28.)  At the time of the alleged assault by

Tedford, the Flint Police Department maintained rules, regulations, policies and

procedures which strictly prohibited Tedford's alleged conduct. Sutter's investigation

determined that Tedford violated fourteen of these rules and regulations. (Def.'s Fact

29, Pl.'s Fact 29.)

Before the incident, the Flint Police's regulations had adopted the law

Enforcement Code of Ethics (the "Code").  This Code, among other things, requires

officers to serve mankind, safeguard lives, develop personal restraint, and protect the

weak and innocent.  (Def.'s Fact 30, Pl.'s Fact 30.)  The Code also requires officers to

"enforce the law courteously and appropriately [without] employing unnecessary force or

violence."  (*Id.*, citing Def.'s Ex. 12 at 42-43.)  The Code also requires officers to

"respect the Constitutional rights of all men to liberty, equality and justice." (*Id.*, citing

Def.'s Ex. 12 at 42-43.)

The Flint Police rules and regulations also require all officers to "obey all laws

of the United States, the State of Michigan, and the City of Flint."  (Def.'s Fact 31, citing

Def.'s Ex. 12 at 46, Pl.'s Fact 31.) Officers are also enjoined from participating in any

incident involving moral turpitude, must always act with integrity and not abuse their positions, and must not act in such a way as to bring discredit to Flint Police officers. (Def.'s Fact 32, citing Def.'s Ex. 12 at 46, Pl.'s Fact 32.)  Officers are forbidden from mistreating persons who are in their custody.  (Def.'s Fact 33, citing Def.'s Ex. 12 at 46, Pl.'s Fact 33.)  Officers must also respect individual and constitutional rights. (Def.'s Fact 34, citing Def.'s Ex. 12 at 46, Pl.'s Fact 34.)

The City also issues periodic policy updates and training relating to conduct by officers.  For example, on April 12, 2006, Chief Hagler issued a memo updating officers on the subject "Deprivation of Rights Under Color of Law." (Def.'s Ex. 13.) In this memo, the chief told the officers to treat individuals and citizens as the officers would want to be treated.  (Def.'s Fact 35, Pl.'s Fact 35.)

Each officer is given a copy of these rules and regulations and is given updates as they are adopted.  (Def.'s Fact 36, Pl.'s Fact 36.)  Defendant asserts that these rules and regulations applied to Inspectors in the CSB as much as to other officers, and both Major Keahey and former Chief Hagler expected the Inspectors to abide by the rules and regulations.  (Def.'s Fact 37.)  Plaintiff admits that testimony supports this assertion, but she argues that the CSB, in reality, was not supervised, particularly on the midnight shift that Tedford worked.  (Pl.'s Fact 37.)

Plaintiff's experts have admitted that Tedford's conduct violated police procedures and ethics.  (Def's Fact 38, Pl.'s Fact 38.)

Defendant has submitted testimony that Flint Police Officers are also provided with extensive training and that it is the policy of the Flint Police to pre-screen all applicants for the Flint Police before they are hired.  (Def's Fact 39, Pl.'s Fact 39.)

Defendant has also submitted testimony detailing that it is also the policy of the Flint Police to ensure that each officer receives adequate training.  Each officer must complete a certified police academy.  (Def's Fact 40, Pl.'s Fact 40.)  Once a Flint Police Officer completes the police academy, he or she must then complete sixteen weeks in the Field Training Officer Program within the Flint Police Department, and, additionally, officers must complete continuing in-service training throughout their careers.  (*Id.*)

Officers are also trained in such areas as ethics, use of force, constitutional rights, civil rights, deprivation of rights under color of law, and cultural diversity and are informed of Flint's harassment policy.  (Def.'s Fact 41, Pl.'s Fact 41.)   Further, everyone in the Flint Police Department was required to pass an ethics test.  (*Id.*)

Defendant has submitted, and Plaintiff has not disputed that during Tedford's time with the Flint Police he developed a reputation as a good police officer.  (Def.'s Fact 42, Pl.'s Fact 42.)  Officer Sergio Thomas, who knew Tedford, testified that Tedford had a good reputation "[w]ithin the department and county as a whole.  He worked the county Narcotics on FANG so he worked in the county as well."  (Def.'s Fact 42, Pl.'s Fact 42.; Thomas Dep. at 32, Def.'s Ex. 15.)  According to Thomas, when people heard of the allegations against Tedford they were in "disbelief" and "shocked." (Def.'s Ex. 15 at 22-24.)

All of the Flint Officers who were deposed testified that they were unaware of any other allegations against Tedford of other sexual misconduct.  (Def.'s Fact 43, Pl.'s Fact 43.)  These same officers testified that they were not aware of a pattern of other constitutional violations by Tedford within the CSB or within the Flint Police in general.

8

(*Id.*)  Tedford did not have a history of problems with discipline.  (Def.'s Fact 44, Pl.'s Fact 44.)

Keahey, Tedford's supervisor in the CSB, also testified that he was not aware of other allegations of sexual assault against Tedford.  (Def.'s Fact 45, Pl.'s Fact 45.)   He had previously averred that he was not aware of a pattern of sexual assault or illegal conduct by Flint officers.  (Def.'s Fact 45, citing Keahy Aff. at ¶¶ 12-13, Def.'s Ex. 16.)[5]

Sutter, who performed the internal investigation of Tedford testified that he was not aware of a discipline problem with Tedford and that Tedford had a clean record.  (Def.'s Fact 46, Pl.'s Fact 46.)  He also testified that his investigation did not reveal anything that would have suggested that Tedford was likely to commit a constitutional violation.  (*Id.*)   When asked about other sexual assault complaints against Flint Police, Sutter testified that he could only recall four such incidents in the past twenty years.  (Def.'s Fact 47, Pl.'s Fact 47.)

One of the claims that Sutter recalled was in 2007, before Tedford's alleged assault, against David Dicks, who was an Inspector in the CSB with Tedford.  (Def.'s Fact 48, Pl.'s Fact 48.)  Sutter personally investigated this claim, and the claim was not sustained because the complainant would not cooperate with the investigation.  (*Id.*)  Both of Dicks's supervisors, Keahey and Chief Hagler, testified that they were not aware of this sexual assault complaint.  (Pl.'s Fact 48.)

---

[5]Plaintiff does not dispute that Keahy has so averred, but she argues that his opinion that there was no "pattern" of sexual assault or illegal activity is inadmissible opinion testimony as a lay witness.  (Pl.'s Fact 45.)

Sgt. Bundy testified that he could recall only one prior allegation of sexual assault and that the officer was fired.  (Def.'s Fact 49, Pl.'s Fact 49.)  Bundy further testified that he did now know of a pattern of any other unconstitutional behavior.  (*Id.*)

Keahey averred that he was not aware of any instances where the Flint Police failed to investigate and appropriately discipline officers accused of illegal conduct.  (Def.'s Fact 50, Pl.'s Fact 50.)

At the time of the alleged rape, Tedford was employed as an Inspector in the Flint Police's CSB where his supervisor was Major Keahey.  (Def.'s Fact 51, Pl.'s Fact 51.)  Usually, Tedford did not work under the direct supervision of Major Keahey because Keahey's schedule did not overlap directly with Tedford's.  (Def.'s Fact 52, Pl.'s Fact 52.)

However, Keahey did stay in regular contact with Tedford and also updated the Police Chief, informally, on the activities of the CSB.  (Def.'s Fact 53, Pl.'s Fact 53.)  Chief Hagler testified, however, that he did not keep day-to-day tabs on the members of the CSB, and he did not know if Tedford worked the days he was scheduled to work.  (Hagler Dep. at 85-87, Def.'s Ex. 2.)

There is evidence suggesting that for seventeen of the nineteen scheduled work days during August 2007, Tedford did not make a single radio call.  (Def.'s Fact 54, Pl.'s Fact 54.)   Plaintiff suggests that the clear inference is that Tedford was skipping work.

Flint's expert submits that, Plaintiff's injury, if any, was the result of Tedford's personal failings unrelated to any policy or custom of the Flint Police Department.  (Def.'s Fact 57.)  Plaintiff's experts conversely found a "constitutionally deficient lack of

10

any supervision . . . by the Flint Police command hierarchy responsible for supervising the [CSB]." (Pl.'s Fact 57.)

Plaintiff has submitted her own facts. Those facts which are relevant to the inquiry before the court are set forth below, with references to Plaintiff's brief. Redundant or irrelevant proposed facts have been omitted.

Plaintiff submits facts to support her contention that Mayor Williamson maintained an inordinate, and inappropriate, degree of control over the CSB. For example, Former Chief of Police Hagler had no role in who was chosen by Mayor Williamson to be part of the CSB, he had no input into what the Mayor's selection criteria were, and he had no knowledge of the creation of the CSB until he saw the press release. (Pl.'s Fact 59, citing Hagler Dep., Pl's. Ex. C at 12-13.) Plaintiff maintains that this was not the only time that Mayor Williamson interjected himself into the hierarchy of the Flint Police Department. (*Id.*, citing Hagler Dep. at 35, 97-98.) Rather, the Mayor gave direct orders to the Flint Police Department without going through its chain of command, and after Hagler told the CSB that they were not supposed to supervise or evaluate other officers, the Mayor countermanded the order (Pl.'s Fact 60, citing Hagler Dep. at 36-37, 99-101.) Hagler did not know which order the CSB followed. (Hagler Dep., Pl's. Ex. C at 101.)

Plaintiff also submits facts to support her contention that Chief Hagler did little to supervise the CSB. Hagler expected Major Keahey to supervise the CSB Inspectors on a daily basis (Pl.'s Fact 60, citing Hagler Dep., Pl's. Ex. C at 85.) However, Hagler did not know whether Keahey required CSB Inspectors to keep a daily log of their work. (*Id.,* Hagler Dep. at 45.) Hagler essentially had very little knowledge of what Inspector

11

Tedford was doing in the weeks and months before his assault on Mize.  (*Id.,* Hagler

Dep. at 50-55.)   Hagler did not know whether Tedford actually worked the days on

which he was scheduled on the CSB schedule.  (Pl.'s Fact 61, citing Hagler Dep. at 86.)

Hagler did not directly assign Tedford to work on the midnight shift; assignments would

have come through his supervisor.  (*Id.*, Hagler Dep. at 49-50.)  Plaintiff submits that the

only two days the dispatch sheet shows Tedford actually reported in for the thirty days

before the September 2, 2007 assault were August 3 and 27, but he should have been

putting in eight hours on all his scheduled days.  (Pl.'s Fact 61.)  Although Plaintiff cites

to page twenty-eight of Chief Hagler's deposition for this proposition, Plaintiff failed to

include the cited page in the Judges' copy of the brief.  Nonetheless, the parties agree

that there is evidence suggesting that for seventeen of the nineteen scheduled work

days during August 2007, Tedford did not make a single radio call.  (Def.'s Fact 54, Pl.'s

Fact 54.)

Additionally, Plaintiff challenges the degree and quality of supervision that

Keahey maintained over the CSB.  When Keahey spoke to Flint personnel officer

Deborah Pitts about the promotion, she told him that the CSB would have a lot of

leeway as to the direction they wanted to take with the assignment.  (Pl.'s Fact 63, citing

Keahey Dep., Pl's. Ex. B at 10.)  Keahey did not require CSB Inspectors to fill out a

daily report of their hours.  (*Id.*, citing Keahey Dep. at 19.)  Per Keahey, Tedford liked

the night shift hours, and he did a lot more patrol work than anyone else in the CSB.

(Pl.'s Fact 64, citing Keahey Dep. at 20-21.)  With Tedford working from midnight to

9:00 a.m, Keahey was not on duty to supervise him.  (Pl.'s Fact 65, citing Keahey Dep.

at 35-37.) During the three months before the assault, after 1:00 a.m., there was no one

12

above Tedford in the chain of command on duty when Tedford was working until someone came in for the day shift.  (*Id.*, Keahey Dep. at 37- 41.)

As Tedford's supervisor, Keahey never checked the dispatch log lists to see what Tedford was doing or when he was out on the road, but instead took Tedford at his word and relied on roll calls and verbal updates.  (Pl.'s Fact 66, citing Keahey Dep. at 58-60.)

Plaintiff submits deposition testimony from various officers regarding the perception of the CSB among police officers.

Eleven-year veteran Flint Police Officer Tanya Meeks worked in community policing until 2006, when the CSB was formed.  (Pl.'s Fact. 69, citing Meeks Dep., Pl's. Ex. F at 4-5, 15-16.)  Meeks felt that she was bumped out of this job by the Mayor when the CSB was formed because she had gone to the Flint City Council and spoken out against the Mayor.   (*Id.*, Meeks Dep. at 17.)  The common perception, according to Meeks, in the Flint Police Department was that the CSB Inspectors were not doing much of anything, they were not being supervised, and they pretty much did whatever they wanted.  (*Id.*, Meeks Dep. at 21-22.)

Flint Police Sgt. John Bundy, who was in the normal Flint Police chain of command, testified that the CSB was separated from the normal patrol officer supervision.  (Pl.'s Fact 70, Bundy Dep, Pl's. Ex. E at 18.)  Bundy's understanding was that CSB job duties were not delineated as to what they were responsible for (Bundy Dep. at 21) and that normal supervision could not give CSB Inspectors any order. (Bundy Dep. at 19.)  Between 3:00 a.m. and 5:00 a.m., there was no CSB supervisor on duty to check on Inspector Tedford and no one else in the rest of the department was

13

designated to supervise Inspector Tedford at the time of the assault.  (Pl.'s Fact 70, Bundy Dep. at 40.)

Lee Ann Gaspar, formerly a Sergeant in Homicide, retired from the Flint Police Department after almost twenty-six years.  (Pl.'s Fact 71, Gaspar Dep., Pl's. Ex. D at 7.)  Morale in her department plummeted after the CSB was formed.  (Gaspar Dep. at 17.)  Comparing the attendance log showing when Tedford was scheduled to work in the month before the assault with the dates it looked like he had actually worked, there appeared to be a lack of supervision of him.  (Gaspar Dep. at 34-37.)  From the information presented to her, it was "obvious" that nobody was supervising CSB Inspectors.  (Gaspar Dep. at 39.)  Gaspar also testified that, for the safety of citizens that Tedford stopped, as well as for his own safety, someone should have been checking on Tedford, at least, every fifteen minutes during the traffic stop (Gaspar Dep. at 40-41.)

At the time of Tedford's assault on Mize, Scott Sutter was the administrative Captain for Flint Police policy and procedures. He worked day-to-day beside then Chief Hagler.  (Pl.'s Fact 72, Sutter Dep., Pl.'s. Ex. A at 15-19.)   After the CSB Inspectors were appointed by the Mayor in December 2006, they received no additional training (Sutter Dep. at 14-15.)  Between December 2006 and September 2007, Sutter never saw Chief Hagler do anything to directly supervise Major Keahey or any of the CSB Inspectors.  (Pl.'s Fact 73, Sutter Dep. at 14-15.)  The job of Major Keahey and the four CSB Inspectors was never clearly defined.  (Pl.'s Fact 74, Sutter Dep. at 16.) There was no job description or amendment to the rules and regulations to cover the CSB.  (Sutter Dep. at 19.)

14

Based on the CSB schedule for July 1, 2007 to September 22, 1007,  (Def's. Ex. 9), Major Keahey's duty schedule was from 4:00 p.m. to 1:00 a.m. and Tedford's schedule was from midnight to 9:00 a.m.  Thus, during this period, there was only one overlapping hour where Keahey was on the job to supervise Tedford.  (Pl.'s Fact. 75, Sutter Dep. at 26-27.)  From 1:00 a.m. until 9:00 a.m., there was nobody supervising Tedford.  (Sutter Dep. at 28.)

Flint's dispatchers would only monitor the CSB officers if they checked in for service; it was "a unique situation because they're inspectors and they're not officers anymore."  (Pl.'s Fact. 76, citing Sutter Dep. at 29-30.)  The fact that dispatch did not check on Tedford for forty-seven minutes after he reported the traffic stop of Mize was unusual because dispatch would never wait longer than thirty minutes to check on a patrol officer.  (Pl.'s Fact 77, Sutter Dep. at 32.)

Sutter was responsible for keeping track of the policies and procedures for the Flint Police Department, but he had no "say-so" with CSB Inspectors or the Major, and he was unaware of any specific policy governing the CSB, beyond the general rules and regulations, because their roles were never clearly defined to the Flint Police Department Command Staff.  (Pl.'s Fact 78, Sutter Dep. at 60-62.)  If there was any oversight of the Inspectors from December 2006 through the end of 2007, it was "minimal."  (*Id.*, Sutter Dep. at 74.)  There was a system to monitor the road patrol, but no similar system to monitor the Inspectors.  (Sutter Dep. at 106.)

Plaintiff has also submitted expert reports in support of her position.  Her experts opine that the complete lack of supervision of Tedford by the Flint Police Department allowed Plaintiff's rape to occur.  (Pl.'s Fact 79, Katsaris Affidavit, Def's. Ex. 14, at 5, ¶

15

2.)  Specifically Katsaris stated:

> Tedford was not in communication with the police department, or any
> supervisors for a period of time that gave him a comfort cushion to believe
> he could commit such acts without supervision, or the need to seek
> authority for access.  There is no evidence in the file, to date, that the Flint
> Police Department questioned their own policy failures that contributed to
> Tedford's belief that such actions would go undeterred, given his role and
> law enforcement mission in his assignment to the Mayor's office. Also
> missing in the investigation of the very policy of the creation of such an
> elite position as was entrusted to Tedford which seemed to remove him
> from the chain of supervision that is created for the very purpose of
> keeping the abuse of authority in check.

(Katsaris Aff., Def's Ex. 14 at 5, ¶ 2.)

Plaintiff's other expert, Francis R. Murphy, states that "Flint Police administration

knew or should clearly have known about the risk involving police officers who commit

sexual misconduct" and "cannot claim not to know about the high risk . . ."  (Pl.'s Fact

80, purporting to cite Murphy report, Def's. Ex.  21 at 8.)[6]  Murphy's December 16, 2008

report concluded that the Flint Mayor's selection and appointment of Tedford to the CSB

"provided an opportunity for Tedford to act in an unsupervised and unbridled manner

violating the constitutional rights of Plaintiff."  (Pl.'s Fact 81, purporting to cite Murphy

report at 15-16.)[7]  In Murphy's opinion, "the Flint Police Department failed to provide

adequate supervision for those appointed, assigned, and/or promoted to the rank of

inspector.  This lack of direct supervision allowed Defendant Ralph Tedford, to act as a

free agent with impunity that also allowed him to violate his position of public trust."

(Pl.'s Fact 82, purporting to cite Murphy report at 18.)[8]  Murphy further opined that "the

---

[6]The cited page was not submitted to the court.

[7]The cited pages were not submitted to the court.

[8]The cited page was not submitted to the court.

16

opportunity for the sexual assault upon Plaintiff would not have occurred had Flint Police instituted appropriate and adequate supervision of police officers regardless of their 'rank'."  (Pl.'s Fact 83, purporting to cite Murphy report at 18.)[9]

Murphy further opined that Flint Police failed to have an adequate system in place to supervise CSB officers in that special assignment because Tedford was allowed to be on patrol service for extended periods of time without any contact with communications or any supervision.  (Pl.'s Fact 85, citing Murphy report at 20.)  It would be "gross deviation from accepted law enforcement supervision and management practices for a police officer working in the field not to have direct supervision." (Pl.'s Fact 86, purporting to cite Murphy report at 21.)[10]  Plaintiff contends that someone having the lawful authority made a conscious decision not to provide supervision to those in this special assignment and not to institute inspections or audits to insure compliance with existing rules and regulations by officers under its command.  (Pl.'s Fact 86, purporting to cite Murphy report at 21.)[11]

Plaintiff further contends that Murphy's report concludes that the Flint Police hierarchy made a conscious decision not to provide necessary training specifically addressing sexual misconduct.  The risk of police officers violating the constitutional rights of citizens by committing sexual misconduct is known across the country and will occur unless police departments take proactive steps to provide both adequate supervision of personnel and adequate training regarding what constitutes sexual

---

[9]The cited page was not submitted to the court.

[10]The cited page was not submitted to the court.

[11]The cited page was not submitted to the court.

17

harassment, sexual misconduct, and abuse of authority under color of law.  (Pl.'s Fact 87, purporting to cite Murphy report at 21-24.)[12]

Tedford stated in his deposition that in response to a complaint that was filed against the CSB unit for having too many Flint Police vehicles parked together at a restaurant, Keahey told the Inspectors the CBS were not bound by this regulation.  (Pl.'s Fact 89.)[13]

When Williamson was asked who supervised the CSB Inspectors, he responded that they policed themselves.  (Pl.'s Fact 90.)

### III.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

---

[12]The cited pages were not submitted to the court.

[13]Plaintiff did not provide documentary support for this fact, nor for Fact 90 because, according to counsel's Rule 56(f) affidavit, the depositions had not yet been prepared.  To date, Plaintiff has not submitted deposition transcripts supporting these two facts.

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") (citation omitted). The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## IV.  DISCUSSION

There is no question in this case that Plaintiff has alleged facts which, if proven, support her claim of a constitutional violation and injury against Tedford.[14]  Both parties recognize, however, that Plaintiff cannot rely on *respondeat superior* liability to hold City of Flint liable under § 1983.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Rather, under *Monell* and its progeny, a city may be held liable only (1) "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, and (2) when there is an "affirmative link between the policy and the particular constitutional violation alleged," *Oklahoma City v. Tuttle*, 471 U.S. 808, 82 3(1985); *see also Petty v. County of Franklin, Ohio,*  478 F.3d 341, 347 (6th Cir. 2007).  Plaintiff must establish that Flint's official policies or customs (or lack thereof) were a "moving force" behind the deprivation of Plaintiff's rights and arose as a result of "deliberate indifference" to her rights.  *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

"[I]n order to impose municipal liability a plaintiff bringing a § 1983 claim against a municipality must therefore identify the policy or custom that caused her injury."  *Ford v. County of Grand Traverse,* 535 F.3d 483, 495 (6th Cir. 2008).  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Id.* (quoting *Bd. of County Comm'rs v.*

---

[14]The court will separately grant Plaintiff's motion for default judgment against Ralph Tedford.

20

*Brown,* 520 U.S. 397, 403-04 (1997)).  Once the policy is identified, "a plaintiff must

show that the municipal action was taken with the requisite degree of culpability and

must demonstrate a direct causal link between the municipal action and the deprivation

of federal rights."   *Bd. of County Comm'rs,* 520 U.S. at 403-04.  As the Sixth Circuit has

phrased it,

> The key inquiry thus becomes whether, in viewing the [municipality]'s
> policy in the light most favorable to [Plaintiff], there was sufficient evidence
> for reasonable minds to find "a direct causal link" between the County's
> policy and the alleged denial of [Plaintiff's] right . . . . *See, e.g., Blackmore
> v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality
> can be liable under 42 U.S.C. § 1983 only if the plaintiff can demonstrate
> that his civil rights have been violated as a direct result of that
> municipality's policy or custom.") (citing *Monell*, 436 U.S. at 694, 98 S.Ct.
> 2018); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (
> "[T]o satisfy the *Monell* requirements[,] a plaintiff must identify the policy,
> connect the policy to the city itself and show that the particular injury was
> incurred because of the execution of that policy." (internal quotation marks
> omitted)).

*Ford,* 535 F.3d at 497 (6th Cir. 2008).

Plaintiff specifically does not argue that the Department has a "custom of

allowing sexual assaults by its officers or that the Department lacks a policy prohibiting

criminal behavior by its officers."  (Pl.'s Resp. at 3.)  Indeed, it is undisputed that

Tedford's actions on the night of September 2, 2007 were in violation of at least

fourteen rules and regulations of the Flint Police Department.  (Def.'s Fact 23, Pl.'s Fact

23.)

Instead, Plaintiff contends that "[t]he constitutional violation chargeable to Flint

arises from its abject failure to implement any policy or procedure of supervision over

the CSB and its Inspectors in the face of the plainly obvious risk that this failure to

supervise presented."  (Pl.'s Resp. at 3.)  As Plaintiff phrases it, "the facts regarding the

21

complete lack of supervision of the CSB unit and Tedford, coupled with Plaintiff's expert Francis Murphy's testimony that police officers have a demonstrable and known propensity to commit sexual assaults when unsupervised, establishes genuine issues of material fact with respect to the Flint Police Department §1983 municipal liability for failing to supervise Tedford."  (*Id.* at 4.)

### A.  Failure to Train

Plaintiff argues that the jury could find that Flint's alleged failure to supervise the CSB was the "moving force" of her injuries.  Although she phrases her claim as one for failure to *supervise*, she relies on two failure to train cases in support of this argument: *City of Canton v. Harris*, 489 U.S. 378 (1989), and *Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir. 1992).   To the extent she alleges a failure to train claim, Plaintiff's claim cannot survive summary judgment.

In *City of Canton*, the Supreme Court held that

the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact . . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality--a 'policy' as defined by our prior cases--can a city be liable for such a failure under § 1983.

*Id.* at 388-89.  Citing *City of Canton*, the Sixth Circuit held in *Russo* that "[t]o establish liability under *City of Canton,* 'the plaintiff must prove . . . that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.'"  *Russo,* 953 F.2d at 1046 (6th Cir. 1992) (quoting *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir.1989)).  Moreover, it is not enough

22

for a plaintiff "to show that his injury could have been avoided if the officer had had more or better training." *Mayo v. Macomb County*, 183 F.3d 554, 558 (6th Cir. 1999).

In order to succeed on such a claim, Plaintiff must show that the inadequacy of the city's training program was the result of deliberate indifference and that inadequacy is closely related to or actually caused Plaintiff's injuries. *Russo*, 953 F.2d at 1046. Even viewing the facts in a light most favorable to Plaintiff, she simply cannot meet this standard. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'r*s, 520 U.S. at 410. Here, Plaintiff relies on her expert testimony that "police officers have a demonstrable and known propensity to commit sexual assaults when unsupervised" in order to establish deliberate indifference. (Pl.'s Resp. at 4.)

As an initial, procedural matter, Plaintiff has not submitted a complete copy of her expert's report in order to rely upon it for summary judgment purposes. Even accepting her assertion as to what the report states, however, it is insufficient to survive summary judgment. It is not enough to aver generally that all police officers have a known propensity to commit sexual assaults. Rather, in failure to train claims, the focus of the court's inquiry is on the training program itself. Here, Defendant has submitted evidence, unchallenged by Plaintiff, demonstrating that Flint Police Officers are provided with extensive training, both before and following their hire. (Def.'s Facts 39-41, Pl.'s Facts 39-41.) As a prerequisite to being hired, each officer must complete a certified police academy. (Def's Fact 40, Pl.'s Fact 40.) Officers are also trained in such areas as ethics, use of force, constitutional rights, civil rights, deprivation of rights under color

23

of law and cultural diversity and are informed of Flint's harassment policy.  (Def.'s Fact

41, Pl.'s Fact 41.)   Further, everyone in the Flint Police Department was

required to pass an ethics test.  (*Id.*)

Courts addressing such claims have uniformly held that a single act of sexual

misconduct by a police officer cannot form the basis of municipal liability under a failure

to train theory.  This court agrees with the reasoning set forth in an unpublished case

from the District of Kansas:

> As noted earlier, the court must apply "rigorous standards of culpability
> and causation" to justify liability on the defendant municipal entities.
> Courts presented with similar complaints of sexual assault have uniformly
> found that training or its absence does not cause the plaintiff's injuries.
> Thus, in *Barney v. Pulsipher*, 143 F.3d at 1308, in which female jail
> inmates brought a § 1983 action alleging rape by jailers, the Tenth Circuit
> first concluded that there was no evidence the county knew of a pattern of
> violations and that there was no evidence the jail training programs were
> inadequate. The court also wrote that "we are not persuaded that a plainly
> obvious consequence of a deficient training program would be the sexual
> assault of inmates. Specific or extensive training hardly seems necessary
> for a jailer to know that sexually assaulting inmates is inappropriate
> behavior." Similarly, in *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir.
> 1996) (internal quotations omitted), the court wrote:  "In light of the regular
> law enforcement duties of a police officer, we cannot conclude that there
> was a patently obvious need for the city to specifically train officers not to
> rape young women. Moreover, even if the training was in some manner
> deficient, the identified deficiency in a city's training program must be
> closely related to the ultimate injury such that the deficiency in training
> actually caused the police officers' offending conduct." *See also Floyd v.
> Waiters*, 133 F.3d 786, 796 (11th Cir.1998); *Sewell v. Town of Lake
> Hamilton*, 117 F.3d 488 (11th Cir.1997). Here, the proper course of
> conduct-refraining from sexual assault and rape-is patent and obvious;
> structured training programs are not required to instill it. Consequently, the
> absence of such programs (even if such absence was proven) is not so
> likely to cause improper conduct so as to justify a finding of liability.

*Williams v. Board of County Com'rs of Unified Government of Wyandotte, Cty,* No.

98-2485-JTM, 2000 WL 1375267, *6 (D. Kan. Aug. 30, 2000) (cited with approval in

*Oliver v. City of Berkley*  261 F. Supp. 2d 870, 884-85 (E.D. Mich. 2003) (Steeh, J.)).

24

The court agrees with the reasoning set forth in *Williams*, as well as the cases cited therein.  Refraining from raping women in police custody is so obvious that even if Flint were silent about such conduct, it would not give rise to a constitutional violation. Moreover, in addition to the training described above, Flint had adopted the Law Enforcement Code of Ethics which requires, among other things, officers to "enforce the law courteously and appropriately [without] employing unnecessary force or violence." (Def.'s Fact 30, Pl.'s Fact 30, citing Def.'s Ex. 12 at 42-43.)  The Flint Police rules and regulations also require all officers to "obey all laws of the United States, the State of Michigan, and the City of Flint."  (Def.'s Fact 31, citing Def.'s Ex. 12 at 46, Pl.'s Fact 31.) Officers are also enjoined from participating in any incident involving moral turpitude, must always act with integrity and not abuse their positions, and must not act in such a way as to bring discredit to Flint Police officers. (Def.'s Fact 32, citing Def.'s Ex. 12 at 46, Pl.'s Fact 32.)  Officers are forbidden from mistreating persons who are in their custody.  (Def.'s Fact 33, citing Def.'s Ex. 12 at 46, Pl.'s Fact 33.)  Officers must also respect individual and constitutional rights. (Def.'s Fact 34, citing Def.'s Ex. 12 at 46, Pl.'s Fact 34.)  Flint's training procedures, coupled with these policies, were sufficient as a matter of law to provide whatever "training" was necessary to inform officers not to rape or sexually assault people in their custody.

Additionally, other than cite the relevant standard for a failure to train claim, Plaintiff does nothing to articulate the contours of any such claim, as applied to her alleged facts.  In light of the reasoning of *Williams*, the fact that Plaintiff does not adequately explain any failure to train claim, the undisputed facts regarding the training

provided to City of Flint officers, and the undisputed fact that Tedford's actions were in violation of at least fourteen rules and regulations of the Flint Police Department, the court will grant summary judgment on any claim based on inadequate training.[15]

## B.  Failure to Supervise

The heart of Plaintiff's claim is her assertion that a jury could find that "Flint completely failed to supervise the CSB Inspectors and that Tedford's assault on Mize was the plainly obvious consequence of Flint's failure to supervise."  (Pl.'s Resp. at 4.) As with her failure to train claim, Plaintiff's failure to supervise claim cannot proceed to a jury.

In order to impose liability, "the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'"  *Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006) (citation omitted).  Plaintiff's theory of liability is that the City of Flint, through its mayor, created a unit which was given an unorthodox degree of "leeway" in carrying out its duties.  Plaintiff argues that this leeway, and the complete lack of supervision over the CSB generally and Tedford individually resulted in Plaintiff's rape.

---

[15] Plaintiff intimates, without directly arguing, that the mayor selected unqualified officers, or at least, less qualified officers, to fill the CSB positions.  To the extent Plaintiff asserts a claim based on inadequate hiring processes, she has failed to establish a genuine issue of material fact on that claim. The Supreme Court has held, regarding a claim of inadequate hiring processes, that "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."  *Bd. of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 412 (1997) (emphases in original).  In this case, Plaintiff has failed to present any evidence to meet this standard.  Moreover, it is undisputed that it is the policy of the Flint Police to pre-screen all applicants for the Flint Police before they are hired.  (Def's Fact 39, Pl.'s Fact 39.)  As such, any claim for inadequate screening or hiring processes fails.

The court has no doubt that a reasonable jury could conclude, based on the evidence presented by Plaintiff, that Tedford was a failure as an officer operating in an ineffectual unit. Plaintiff could prove, at least by inference, that Tedford rarely reported for duty and, when he did, he rarely accomplished anything. Plaintiff could also prove that Tedford's supervisors did not know what, if anything, Tedford did while on duty and that he, in fact, did not have any direct supervision during the nine months he was in the CSB. There is also evidence that the CSB as a unit was not well-run and was treated as somehow separate from the rest of the Flint Police Department. Plaintiff also has submitted evidence that the common perception in the Flint Police Department was that the CSB Inspectors were not doing much of anything, they were not being supervised, and they pretty much did whatever they wanted.

But to find that the officers on the CSB were unsupervised and derelict in their duties as officers of the law is not the same as to find that the "plainly obvious" result of the lack of supervision was the violent sexual assault on Plaintiff. Plaintiff relies heavily on *Brown v. Bryan County, Okl.,* 219 F.3d 450 (5th Cir. 2000), in which the Fifth Circuit affirmed a jury verdict against a county defendant, based upon its failure to supervise an officer and the resulting excessive force used on the plaintiff. The court held:

> Specifically, on the evidence before it, the jury could have concluded that the County, abetted by its policy of failing to supervise untrained deputies, allowed Burns to participate in the pursuit and arrest of Brown and that his lack of training in safety precautions and in arrest situations and in actually making the arrest, was the "moving force" that caused the injuries inflicted upon her.

*Id.* at 464. In *Brown*, however, the resultant injury, excessive force during an arrest, was directly linked to the inadequacy of the county's supervision and training protocols. As the court explained:

27

The jury could have also concluded that the County's policy of not providing proper supervision, a component of the County's policy of no training (beyond the possible availability of CLEET), contributed to the causal force behind the constitutional deprivation suffered by Jill Brown. The evidence supports a conclusion that Burns was unsupervised and unarmed throughout the incident. His decision to join Morrison was his personal decision, made without supervisory approval. Officer Morrison himself stated that he was not in charge of Burns that evening. Morrison admits he gave Burns no explicit instructions before or during the episode. Burns testified that he received none. Given Burns's lack of training and lack of protection in the form of a sidearm, Ms. Brown's expert testified that Burns should never have been permitted to leave the vehicle. Morrison allowed Burns to exit the vehicle, even though Morrison testified that he himself was in "great fear," and drew his weapon. Morrison knew that Burns did not have a gun. If there was a training program, according to the expert testimony that the jury could have believed, Morrison likely would have ordered Burns to remain in the patrol car. Finally, according to Brown's expert, the discovery record indicates a total absence of any communication or coordination between Morrison and Burns during the entire incident. The County's expert found fundamental fault in the supervisory relationship during the incident, a fault that contributes to the consequences of the lack of training.

*Id.* at 465. In other words, it was plainly obvious that if an officer is not trained or

supervised in effectuating an arrest, could result, under the circumstances presented in

*Brown*, in excessive force being utilized by an officer. Here there is no evidence

creating a triable issue of fact that the plainly obvious result of Tedford's lack of

supervision would be a sexual assault.

Plaintiff attempts to rely on her expert's testimony to create an issue of fact

regarding causation and deliberate indifference. It is somewhat difficult to assess this

claim given that Plaintiff has not submitted a complete copy of her expert's report.

Nonetheless, accepting that the report states what Plaintiff asserts in her proffered

facts, Murphy's December 16, 2008 report purportedly concludes that the Flint Mayor's

selection and appointment of Tedford to the CSB "provided an opportunity for Tedford to

act in an unsupervised and unbridled manner violating the constitutional rights of

28

Plaintiff." (Pl.'s Fact 81, citing Murphy report at 15-16.)  In Murphy's opinion, "the Flint

Police Department failed to provide adequate supervision for those appointed,

assigned, and/or promoted to the rank of inspector.  This lack of direct supervision

allowed Defendant Ralph Tedford, to act as a free agent with impunity that also allowed

him to violate his position of public trust."  (Pl.'s Fact 82, purporting to cite Murphy report

at 18.)  Murphy further opined that "the opportunity for the sexual assault upon Plaintiff

would not have occurred had Flint Police instituted appropriate and adequate

supervision of police officers regardless of their 'rank.'"  (Pl.'s Fact 83, purporting to cite

Murphy report at 18.)  Murphy's report goes on to state that the Flint Police failed to

have an adequate system in place to supervise CSB officers in that special assignment

because Tedford was allowed to be out of patrol service for extended periods of time

without any contact with communications or any supervision.  (Pl.'s Fact 85, citing

Murphy report at 20.)  It would be "gross deviation from accepted law enforcement

supervision and management practices" for a police officer working in the field not to

have direct supervision."  (Pl.'s Fact 86, purporting to cite Murphy report at 21.)

Likewise, Plaintiff's other expert, Katsaris, opines that the complete lack of supervision

of Tedford by the Flint Police Department allowed Plaintiff's rape to occur.  (Pl.'s Fact

79, Katsaris Affidavit, Def.'s Ex. 14, at 5, ¶ 2).

        Even taking all of these largely unsupported assertions as true, the most that

Plaintiff can prove through her experts is that the City of Flint was negligent in its

supervision of the CSB and Tedford and that negligence allowed, or created the

opportunity, for Plaintiff's rape to occur.  Being able to prove negligence, or opportunity,

is not the same thing, however, as being able to prove that the City's lack of supervision

was a "moving force" behind the deprivation of Plaintiff's rights and arose as a result of "deliberate indifference" to her rights. *See Doe*, 103 F.3d at 508.   Plaintiff cites a Third Circuit case for the proposition that "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir. 1990).   Here, however, the link between the City's lack of supervision and Plaintiff's rape is too tenuous to allow this case to proceed to trial.   The Supreme Court has specifically cautioned against imposing municipal liability in such cases.   *See City of Canton*, 489 U.S. at 391-92 ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.   In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

Plaintiff further contends that Murphy's report concludes the risk of police officers violating the constitutional rights of citizens by committing sexual misconduct is known across the country and will occur unless a police department takes proactive steps to provide both adequate supervision of personnel and adequate training of what constitutes sexual harassment, sexual misconduct, and abuse of authority under color of law.   (Pl.'s Fact 87, purporting to cite Murphy report at 21-24.)   This court has recently rejected a similar argument as legally insufficient in *Balbridge v. Jeffreys*, No. 07-15130, 2009 WL 275669 (E.D. Mich. Feb. 5, 2009).   The court held, in *Balbridge*,

> Rather, in order to find a triable issue, the court must find that any time a male guard supervises a female inmate, or a female inmate with a known or unknown history of sexual abuse, that inmate is at risk of being assaulted by the prison guard.   Even more, the court must find that a

30

> reasonable jury could conclude that the risk is so great that it constitutes deliberate indifference for a municipality to not have a policy specifically prohibiting this conduct while guarding off-site.  The court cannot sustain this position.

*Id.* at *6; *see also Hovater v. Robinson,* 1 F.3d 1063, 1066-67 (10th Cir. 1993) ("[I]n order to determine that a constitutional violation could have occurred, we must conclude that a male guard having sole custody of a female inmate creates such a risk to her safety that it constitutes a violation of the Eighth Amendment's cruel and unusual punishment clause. We are unable to do so.").  Likewise, in this case, in order to allow Plaintiff's argument to proceed to trial, the court must accept as a viable legal theory that anytime a police officer is left unsupervised it is "plainly obvious" that a rape could occur.  The court rejected such an argument in *Balbridge*, and it will again reject it here.  As the Western District of Virginia stated in an unpublished case:

> The Court finds a policy or custom of transporting female inmates alone with male guards is not unconstitutional, *because the majority of men, and the majority of prison guards, are not rapists merely waiting for an opportunity to assault a woman.* This is not to say that this policy is wise, or that a different policy would not have protected the Plaintiff's undeniable right to bodily integrity more effectively. But absent a showing that transportation by a male guard alone is tantamount to a sentence of rape for any women unfortunate enough to suffer it, the policy cannot be said to have caused the rape. Rather, the policy failed to prevent the rape, which is inadequate as a matter of law to support liability.  *See Milligan*, 743 F.2d at 230.

*Doe v. Cunningham,* No. 3:06-CV-00019,  2006 WL 2819600, *2 (W.D. Va. Sept. 28, 2006) (emphasis added) (citing *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984)); *see also Heckenlaible v. Virginia Peninsula Reg'l Jail Auth.*, 491 F. Supp.2d 544, 555 (E.D. Va. 2007) (agreeing with the reasoning of *Doe*, but finding that such a policy may nonetheless be negligent under state law)).  A jury could find that Flint's lack of supervision was negligent, but it simply could not find that it constituted

31

deliberate indifference to Plaintiff's right to be free from sexual assault.  This is not a situation where the City failed to supervise even after repeated complaints of sexual misconduct.  *Contra Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1248 (6th Cir. 1989) ("Given the district court's finding of deliberate indifference by the Sheriff in that at least fourteen other paraplegics had received similar deplorable treatment, it is fair to say that the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the County as an entity can be held liable here for the extent of Leach's determined damages.").  At most, Plaintiff has only identified one prior sexual complaint against the CSB, which was not against Tedford and which the complainant did not pursue. Indeed, Sutter could only recall four total sexual assault complaints against Flint Police in the past twenty years.  These undisputed facts cannot establish a constitutionally deficient failure to supervise.  Plaintiff cannot show the required "widespread pattern of constitutional violations that [Flint's] actions or inactions amounted to a deliberate indifference to the danger" of Tedford sexually assaulting Plaintiff.  *Doe v. Claiborne County, Tenn. By and Through Claiborne County Bd. of Educ. ,* 103 F.3d 495, 513 (6th Cir. 1996).  Nor can Plaintiff show that Flint "encouraged the specific incident of misconduct or in some other way directly participated in it," *id.,* or that Flint *"*authorize[d], approve[d], or knowingly acquiesce[d] in [Tedford's] unconstitutional conduct," *id.*, or that "the risk of a constitutional violation arising as a result of [Flint's failure to supervise was] 'plainly obvious.'"  *Gregory*, 444 F.3d at 752-53.  Accordingly, Defendant's motion for summary judgment must be granted as to the City of Flint.

## V.  CONCLUSION

IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 26] is

GRANTED.

                                    S/Robert H. Cleland
                                   ROBERT H. CLELAND
                                   UNITED STATES DISTRICT JUDGE

Dated:  May 29, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, May 29, 2009, by electronic and/or ordinary mail.

                                    S/Lisa Wagner
                                   Case Manager and Deputy Clerk
                                   (313) 234-5522